# Cases

# SECOND DEPARTMENT,

AT

# GENERAL TERM,

## September, 1878.

---

IN THE MATTER OF THE LAST WILL AND TESTAMENT OF
BENJAMIN F. ARNOLD.

*Probate of will — testamentary capacity — opinion of experts — of non-experts — admissibility of.*

On an application to set aside the probate of a will on the ground that the testa-
tor was of unsound mind, a physician, who attended him about a week after
a stroke of paralysis, having been asked if he understood what was meant
in law or medical jurisprudence by the term testamentary capacity, and
answered in the affirmative, was asked, against proponent's objection and
exception, "Did you consider him possessed of that power between the time
of his shock and the time of his death." *Held,* that it was error to allow
the witness to answer the question.

Other non-professional witnesses, who had been acquainted and had had conversa-
tions with the testator, were asked to state upon the facts as to which they had
testified, and from what they had observed, what opinion they had formed;
"of his soundness or unsoundness of mind after the shock;" "as to his
being *compos mentis* or otherwise;" "was he, in your judgment, of sound
mind and memory." *Held,* that it was error to allow these questions to be
put and answered.

APPEAL from a decree of the Surrogate of Dutchess county,
revoking the probate theretofore granted of the will of Benjamin
F. Arnold, deceased.

*Thompson & Weeks,* for the executors.

*Hackett & Williams,* for the legatees, etc., appellants.

*H. A. Nelson* and *Edward Crummey,* for Alexander H. Arnold, respondent.

BARNARD, P. J.:

Benjamin F. Arnold died at Pawling, in Dutchess county, in January, 1874. He was about sixty-eight years of age at the time of his death. He left a widow and seven children; five sons and two daughters. He left what purported to be a will and codicil, whereby the testator's sons, Alexander and George, were deprived of any interest in the estate of the testator which amounted to about $17,000; and Mary E. Tabor, a daughter, was given only a life estate in one-seventh; and at her death, this share was given to testator's sons and daughters, excluding Alexander and George. Mrs. Tabor had a young child then living. This will and codicil was proved, without objection, in April, 1874. Alexander H. Arnold appeared to have the probate revoked, within the year after the probate; and, under the direction of the surrogate, the proceedings returned upon this appeal were taken to re-probate the will under the objections that the testator did not execute the will in the manner required by law; that he had no sufficient capacity to execute a will, and that the same was procured by undue and improper influence.

Upon the trial, evidence was given by proponents that the will was executed on the 8th of December, 1872; that the codicil was executed 26th July, 1873. The evidence given to show that the testator was of sound mind was very strong; and, if credited, entirely unanswerable.

That the testator gave his own instructions as to the provisions of the will and codicil, and gave clear and satisfactory reasons for the apparent inequality; that his mental faculties were substantially unimpaired; that he continued to do business as usual until after the date of the codicil; that he was, shortly after the execution of the will, elected a director of the Pawling Bank, and was qualified and served; that he executed important papers, with the

knowledge and assent of all the family, including the contestant. Upon the other hand, the testimony given by the contestant showed an absolutely clear case of almost entire imbecility, if the evidence was credited; that testator was insane before the 5th of December, 1872, and really did no business, except through his sons, chiefly Alexander, the contestant; that he was subject to delusions before that date; that on the 5th of December, 1872, he was stricken with paralysis, entirely disabling his right side; that for some days he knew nothing; that, while in this state, early on a Sunday morning, and with great secrecy, two witnesses attended at the sick-room, and that the will was executed while he was in this condition; that, physically, he did improve a little subsequently, but never so as to be of sound mind; that he was never free from delusions, and that on the day of the date of the codicil, he did not know an old friend and acquaintance. In passing upon such an evenly-balanced case, and when it would seem that the difference could not be the result of a mistake only, it is manifest that the evidence received should be such as is admissible in law. I think it quite clear that the surrogate erred in the admission of evidence offered by the contestant upon the capacity of testator.

In *Hewlett* v. *Wood* (55 N. Y., 634), the rule is established that witnesses, testifying as experts, may "give opinions upon questions of trade, skill or science from facts proven, or the circumstances noted by themselves."

I think this principle was violated by the admission of the questions put to Dr. Pearce, as follows:

Q. Do you understand what is meant in law or medical jurisprudence by the term, "testamentary capacity?"

A. I do.

Q. Did you consider him possessed of that power between the time of his shock and the time of his death? Objected; and objection overruled and excepted by proponents.

A. No, sir; I do not think he was.

The case shows that Dr. Pearce did not see the testator to any extent after about a week from the attack of paralysis.

In reference to the testimony of persons not experts, the same case establishes the rule that they "may testify to facts and inci-

dents known or observed by them," which tend to show sound-ness of mind, or the contrary ; and may testify to the impression produced upon them by what they beheld or heard, and whether the acts and declarations thus testified to seemed to them rational or irrational; " but they may not express an opinion as to the general soundness or unsoundness of mind of the testator, nor as to the competency of the testator to execute a will." This rule seems to have been violated. This question was presented to the witness Alphus Carl, and substantially to E. D. Burhans.

Q. From the conversation that you had with him at that time, and from what you saw of him, as stated here in your evidence, and from your observation of him not stated in evidence, what opinion did you form of his soundness or unsoundness of mind, after the shock of paralysis ? Objected to, and objection over-ruled; exception by proponent.

A. Well, I should think he was not a sound man in his mind, as far as I could see him.

This question was improperly admitted to the witness Stark.

Q. What opinion did you form with reference to his condition at these times, after the paralysis, as to his being *compos mentis*, or otherwise ?

A. I never thought after the first time I saw him, after the paralysis, that he was competent to do business.

Also, in the question put to the witness Sarah Wilson.

Q. From what you saw of him, as well as what you have stated herein as the occurrences that you cannot now remember, was he at any time after the shock, and during your stay there, in your judgment, of sound mind and memory ? Received; exception by proponents.

A. He was not.

The same question, in substance, was put to Charles Dodge, George A. Barker, John Townsend, Emory O. Banks, with the same answer in each case.

The evidence of these opinions was improperly received. With-out this improper testimony, I think the will and codicil was improperly rejected.

Upon the question of infirmity of mind before the shock, the witness J. W. Stark agrees with the proponent's witnesses, that

there was no appearance of unsoundness before the attack. The witness Price, who saw testator the day of the shock, or the next day, testified to no act or language indicating unsoundness of mind. The testator knew him and conversed rationally with him. Very many of the acts and declarations testified to by the contestants happened long after the will, and many after both will and codicil. It is not necessary to find that the testator remained sane until his death; he must have been of sound mind when the papers were executed. There is no convincing proof of unsoundness at the date of the papers. Upon the whole case, I think the decreee should be reversed and the question sent to a jury for trial. Costs to appellants out of the estate.

GILBERT and DYKMAN, JJ., concurred.

Decree of surrogate reversed, and issue sent to jury for trial.